**BURSOR & FISHER, P.A.**
L. Timothy Fisher (*Pro Hac Vice Forthcoming*)
Daniel S. Guerra (*Pro Hac Vice Forthcoming*)
Joshua B. Glatt (*Pro Hac Vice Forthcoming*)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
dguerra@bursor.com
jglatt@bursor.com

*Attorneys for Plaintiff and the Putative Classes*

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| MATTHEW BUNCH, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>IDSCAN.NET, INC.<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Matthew Bunch ("Plaintiff") brings this action individually and on behalf of all others similarly situated against Defendant IDScan.Net, Inc. ("IDScan") ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Plaintiff brings this class action lawsuit on behalf of all individuals who had their data breached by IDScan, all individuals in California who had their data breached by IDScan.

2. Plaintiff seeks to hold Defendant responsible for the injuries inflicted on Plaintiff and millions of similarly situated individuals across the country ("Class Members") and California ("California Subclass Members") due to Defendant's impermissibly inadequate data security, which caused the theft of their personally identifying information ("PII") such as the names, addresses, and driver's license numbers (the "Data Breach" or "Breach"). Initial knowledge of the Breach was made public on or around September 1, 2026.[1]

## JURISDICTION AND VENUE

3. This Court has personal jurisdiction over Defendant IDScan because Defendant is at home in this District.

4. This Court has personal jurisdiction over Defendant because Defendant resides in this district.

5. This Court has subject matter and diversity jurisdiction over this Action under 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this is a class action wherein the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100

[1] Krebson Security, *FBI Probes Service Selling 153M+ Drivers Licenses,* available https://krebsonsecurity.com/2026/09/fbi-probes-service-selling-153m-drivers-licenses/.

members in the proposed Classes, and at least one Class Member is a citizen of a state different from Defendant.

6. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant is at home in this District and a substantial portion of the events giving rise to Plaintiff's claims occurred in this District.

## THE PARTIES

7. Plaintiff Matthew Bunch is a natural person and citizen of California who resides in West Sacramento, California. On September 18, 2025, Plaintiff rented a car through Hertz in this District. Hertz is a client of IDScan. IDScan's database of driver's licenses was hacked in the relevant breach at issue in this action. Accordingly, Plaintiff is one of millions of individuals whose information was breached by IDScan and Hertz.

8. Defendant IDScan.net, Inc. is a Louisiana corporation with its principal place of business in New Orleans, Louisiana. Defendant IDScan owns, operates, develops, and maintains the IDScan.net database.

## FACTUAL ALLEGATIONS

### A. Background On Data Breaches

9. A data breach is an incident in which sensitive, protected, or confidential data has potentially been viewed, stolen, or used by an individual unauthorized to do so.[2]

10. Data breaches are becoming increasingly more common and harmful. In 2014, 783 data breaches were reported, with at least 85.61 million total records exposed.[3] In 2019, 3,800 data breaches were reported, with at least 4.1 billion total records exposed.[4]

---

[2] *See* Juliana de Groot, *The History of Data Breaches*, Fortra (Nov. 12, 2018), https://digitalguardian.com/blog/history-data-breaches.

[3] *See id.*

[4] *See* Dan Rafter, *2019 Data Breaches: 4 Billion Records Breached So Far*, Norton (Aug. 18, 2018), https://us.norton.com/internetsecurity-emerging-threats-2019-data-breaches.html.

The average cost of a data breach in the United States in 2019 was $8.19 million.[5]

11. Consumers are harmed in a variety of ways by data breaches. First, consumers are harmed financially. According to the IBM and Ponemon Institute's 2019 "Cost of a Data Breach" report, the average cost of a data breach per consumer was $150 per record.[6] However, other estimates have placed the costs even higher. The 2013 Norton Report estimated that the average cost per victim of identity theft—a common result of data breaches—was $298 dollars.[7] And in 2019, Javelin Strategy & Research compiled consumer complaints from the U.S. Federal Trade Commission ("FTC") and indicated that the median out-of-pocket cost to consumers for identity theft was $375.[8]

12. Identity theft is one of the most problematic harms resulting from a data breach. With access to an individual's PII, criminals can do more than just empty a victim's bank account – they can also commit all manner of fraud, including obtaining a driver's license or official identification card in the victim's name, but with the thief's picture. In addition, identity thieves may obtain a job, rent a house, or receive medical services in the victim's name. Identity thieves may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[9]

13. Consumers are also harmed by the time they spend rectifying the effects of a data breach. A Presidential identity theft report from 2007 states that:

---

[5] *See* IBM Security, *Cost of a Data Breach Report* (2019), https://insights.integrity360.com/hubfs/2019-cost-of-a-data-breach-report-04_03025203USEN.pdf.

[6] *See id*.

[7] *See* Norton by Symantec, *2013 Norton Report* (2013), https://www.hearst.com/documents/33329/653025/2013+Norton+Report.pdf/9042fbe0-7640-de50-63b1-a0915ff91f4a?t=1581612867150.

[8] *See* Insurance Information Institute, *Facts + Statistics: Identity Theft and Cybercrime*, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (citing the Javelin report).

[9] *See* U.S. Federal Trade Commission, *Warning Signs of Identity Theft*, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft.

> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts, open new ones, and dispute charges with individual creditors.[10]

14. Further, the effects of a data breach on consumers are not temporary. In a report issued by the U.S. Government Accountability Office ("GAO"), the GAO found that "stolen data may be held for up to a year or more before being used to commit identity theft," and "fraudulent use of [stolen information] may continue for years" after the stolen information is posted on the Internet.[11] Thus, consumers can lose years' worth of time dealing with a data breach.

15. The existence of these problems is not always immediately ascertainable. As the GAO Report describes:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen, data has been sold or posted on the web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

16. Consumers are also harmed by the lost value of their data. PII represents important, highly valuable property rights.[12] PII can be easily commodified, allowing the

---

[10] U.S. Federal Trade Commission, *The President's Identity Theft Task Force, Combating Identity Theft: A Strategic Plan* (Apr. 2007), https://www.ftc.gov/sites/default/files/documents/reports/combating-identity-theft-strategic-plan/strategicplan.pdf.

[11] *Remijas v. Neiman Marcus Group, LLC*, 794 F.3d 688, 694 (7th Cir. 2015) (citing U.S. Gov't Accountability Office, GAO–07–737, Report to Congressional Requesters: Personal Information (2007)).

[12] *See* John T. Soma et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J. L. & Tech. 11, at 3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

information to be bought and sold.[13] This information "has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets."[14]

17. Thus, when consumers' PII is disclosed without their consent, consumers are deprived of both the ability to choose what is done with their information as well as the full monetary value of their information.

**B. The IDScan Data Breach**

18. IDScan is an AI-powered identity and verification and data automation software company. IDScan's models are trained on hundreds of millions of identity documents to catch fake IDs and synthetic identities that other systems miss.[15]

19. On September 1, 2026, Krebson Security reported that digital scans of more than 153 million driver's licenses were leaked to the dark web."[16] Krebson Security reported that the likely source of the breach was IDScan.[17]

20. Krebson Security also reported that many of the victims had rented a car from Hertz, which uses IDScan to verify its customers' identities.[18]

21. As a result of the breach, individuals who had their identities verified by IDScan, and those who rented a car through Hertz and had their identities verified by IDScan, had their documents and information sold on the dark web. This included, among other records, their driver's licenses, medical cards, employment records, and residence cards.

**C. Defendant's Negligence Put Individuals at Risk**

22. With consumer's PII, including names, addresses, driver's license numbers, and potentially more stolen, they are now at risk of further identity-related harm.

---

[13] *See* Robert Lowes, *Stolen EHR [Electronic Health Records] Charts Sell for $50 Each on Black Market*, Medscape (Apr. 28, 2014), https://www.medscape.com/viewarticle/824192.

[14] *See* Soma, *supra*, note 12.

[15] *See* https://idscan.net/veriscan-age-verification-visitor-management-software/.

[16] Krebson Security, *supra* note 1.

[17] *Id.*

[18] *Id.*

23. By obtaining, collecting, and storing the PII of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the PII from disclosure.

24. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiff and Class Members provided their PII to the companies who contract with IDScan with the reasonable expectation that those companies, including Hertz and IDScan, would keep their sensitive PII confidential, securely maintain their systems, use the PII for identity verification only, and only disclose the information to authorized and trusted personnel.

25. Defendant has a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties. Defendant has a legal duty to keep consumers' PII safe and confidential. It failed.

26. The information held by IDScan at the time of the Breach reportedly includes individuals' names, addresses, driver's license numbers, medical cards, employment records, and residence cards, which may contain additional identifying information.

27. The PII of individuals remains of high value to criminals, as evidenced by the lengths they will go to access it and the purported value they put on it in ransom requests. Numerous sources cite dark web pricing for stolen identity credentials.[19]

**D. Defendant Failed to Comply with FTC Guidelines**

33. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an 'unfair practice' in violation of

---

[19] Anita George, *Your Personal Data is For Sale on the Dark Web. Here's How Much it Costs*, Digital Trends, https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (Oct. 16, 2019).

Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

34. In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Businesses, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal consumer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

35. Importantly, in 2022, the FTC chair Linda M. Khan issued a "[p]olicy Statement on Education Technology," in which she released guidance to education technology companies, ensuring that "children can do their schoolwork without having to surrender to commercial surveillance practices." "There are early indications that these types of commercial surveillance practices are beginning to invade ed tech, creating the risk that students will be profiled and targeted—and that their sensitive information could be exposed as part of a data breach."

36. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

37. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential

consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

38. As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices and Hertz failed to audit, monitor, or ensure the integrity of its vendor's data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

39. Defendant was at all times fully aware of its obligation to protect the PII of consumers, and its clients' customers, yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**E. Defendant Failed to Comply with Industry Standards**

40. Despite its alleged commitment to taking reasonable measures to secure sensitive PII, Defendant does not follow industry standard practices in securing PII.

41. Some industry best practices that should be implemented by companies dealing with sensitive PII, like Defendant, include but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

42. Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

43. Accordingly, actors like Defendant, are aware of the importance in protecting PII and individuals' records. Yet Defendant failed to comply with industry standards in protecting this.

44. Defendant failed to comply with these accepted standards in the industry, thereby permitting the Data Breach to occur.

### F. Common Injuries and Experiences of Plaintiff and Class Members

45. Plaintiff and Class Members are individuals who needed to have their identities verified by companies they wished to do business with, whether that be renting a car, going to the gym, or returning an item. In doing so, Plaintiff and Class Members were required to provide Defendant IDScan, through its ID verification system, their driver's licenses, travel documents, or identification cards, which contain their PII including but not limited to, their names, addresses, driver's license numbers' medical cards, employment records, and residence cards.

46. At the time of the data breach, Defendant IDScan retained Plaintiff's, and Class Members' PII in its system.

47. Plaintiff would not have entrusted his PII to Defendant had he known of Defendant's lax data security policies.

48. Because of the Data Breach, Defendant inflicted injuries upon Plaintiff and Class Members, including but not limited to, their PII ending up in the possession of criminals and for sale on the dark web, the risk of identity theft, invasion of privacy, and the continued mitigation of the materialized risk of identity theft.

49. Plaintiff and Class Members entrusted Defendant with their PII. Plaintiff had a reasonable expectation and understanding that Defendant would take—at minimum—industry standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify them of any data security incidents. After all, Plaintiff would not have entrusted his PII to any entity that used

Defendant's services had he known that Defendant would not take reasonable steps to safeguard confidential information.

50. The unencrypted PII of Plaintiff and Class Members has already ended up for sale on the dark web through a service called Nexus.[20] This is the *modus operandi* of hackers. Nexus offered access to digital scans of identity documents on more than 170 million people in North America.[21] It "claim[ed] to have more than 153 million drivers licenses for people in the United States and Canada, as well as more than 10 million identification cards; more than three million travel documents and/or international IDs; and at least 579,000 medical cards."[22] Figure 1 is a screen capture of the record totals listed by category by the Nexus identity theft service.[23]

**Categories**

| | |
|---|---|
| **Drivers License** | 153,347,439 records |
| **Identification Card** | 10,335,678 records |
| **Uncategorized** | 5,092,107 records |
| **Travel Documents** | 1,924,144 records |
| **International DL/ID** | 1,379,886 records |
| **Medical Cards** | 579,201 records |
| **Common Access Card** | 429,314 records |
| **Residence Card** | 91,873 records |
| **Employment Authorization** | 77,155 records |

**Figure 1**

[20] Krebson Security, *supra.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

51. In addition, unencrypted PII may fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the PII of Plaintiff and Class Members.

52. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes.

53. Plaintiff and Class Members suffered actual injury from having their PII compromised in the Data Breach including, but not limited to, (a) damage to and diminution in the value of their PII—a form of property that Defendant obtained from Plaintiff; (b) violation of their privacy rights; (c) the likely theft of their PII; (d) fraudulent activity resulting from the Breach; and (e) present and continuing injury arising from the increased risk of additional identity theft and fraud.

54. As a result of the Data Breach, Plaintiff and Class Members also suffered emotional distress because of the release of their PII—which they believed would be protected from unauthorized access and disclosure. Now, Plaintiff and Class Members will suffer anxiety about unauthorized parties viewing, selling, and/or using their PII for nefarious purposes like identity theft and fraud.

55. Plaintiff and Class Members have a continuing interest in ensuring that their PII, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

56. Defendant's failure to properly notify Plaintiff and members of the proposed Class of the Data Breach exacerbated Plaintiff's and the Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

## CLASS ALLEGATIONS

57. ***Class Definition***: Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Class and Subclass of similarly situated individuals:

(a) ***Nationwide Class.*** Plaintiff seeks to represent a class of similarly situated individuals, defined as all persons in the United States whose PII was exposed in Defendant IDScan's 2026 Data Breach (the "Class" or "Nationwide Class").

(b) ***California Subclass.*** Plaintiff also seeks to represent a subclass of all California residents whose PII was exposed in Defendant IDScan's 2026 Data Breach (the "California Subclass").

58. Excluded from the Class and Subclass are: (1) Defendant and its officers, directors, employees, principals, affiliated entities, controlling entities, and other affiliates; (2) the agents, affiliates, legal representatives, heirs, attorneys at law, attorneys in fact, or assignees of such persons or entities described herein; and (3) the Judge(s) assigned to this case and any members of their immediate families.

59. Plaintiff reserves the right to amend the definition of the Class and Subclass if discovery or further investigation reveals that the Class or Subclass should be expanded or otherwise modified.

60. ***Numerosity.*** Members of the Class and Subclass are so numerous that their individual joinder herein is impracticable. Members of the Class and Subclass number in the hundreds of millions. The precise number of Class Members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class Members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

61. ***Commonality and Predominance***. Common questions of law and fact exist as to all Class and Subclass Members and predominate over questions affecting only

individual Class and Subclass Members. Common legal and factual questions include, but are not limited to:

(a) Whether Defendant knew or should have known that its systems were vulnerable to unauthorized access;

(b) Whether Defendant failed to take adequate and reasonable measures to ensure its data systems were protected;

(c) Whether Defendant failed to take available steps to prevent and stop the breach from happening;

(d) Whether Defendant owed a legal duty to Plaintiff and Class Members to protect their PII;

(e) Whether Defendant breached any duty to Plaintiff and Class Members by failing to exercise due care in protecting their PII;

(f) Whether Plaintiff and Class Members are entitled to actual, statutory, or other forms of damages, and/or other form of monetary relief;

(g) Whether Plaintiff and Class Members are entitled to equitable relief, including, but not limited to, injunctive relief or restitution; and

(h) Whether Plaintiff and Members of the Class and Subclass are entitled to attorneys' fees and costs.

62. ***Typicality.*** The claims of the named Plaintiff are typical of the claims of the Class and Subclass in that Plaintiff and members of the proposed Class and Subclass were subject to the data breach and had their PII accessed by and/or disclosed to unauthorized third parties.

63. ***Adequacy.*** Plaintiff is an adequate representative of the Class and Subclass because Plaintiff has no interests antagonistic to Class and Subclass Members' interests, Plaintiff has retained counsel with considerable experience and success in prosecuting complex class actions and data privacy cases, and Plaintiff and the undersigned counsel intend to prosecute this action vigorously. The interests of the Class and Subclass Members will be fairly and adequately protected by Plaintiff and Plaintiff's counsel.

64. ***Declaratory and Injunctive Relief.*** The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendant. Such individual actions would create a risk of adjudications that would be

dispositive of the interests of other Class members and impair their interests. Defendant has acted and/or refused to act on grounds generally applicable to the Class, making injunctive relief or corresponding declaratory relief appropriate.

65. ***Superiority.*** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Each individual Class and Subclass Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues. Thus, the Class and Subclass are readily definable and prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, ensures uniformity of decisions, and permits claims to be handled in an orderly and expeditious manner.

66. Defendant has acted or failed to act on grounds generally applicable to the Class and Subclass, thereby making appropriate final injunctive relief with respect to the Class and Subclass as a whole.

67. Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff and members of the Class and Subclass and will likely retain the benefits of its wrongdoing.

68. Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

**<u>COUNT I</u>**
**Negligence and Negligence *Per Se***
**(On Behalf Of The Nationwide Class And California Subclass)**

69. Plaintiff hereby re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

70. Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class and California Subclass against Defendant.

71. Hertz collected the PII of Plaintiff and Class Members as part of its business in order to have Defendant IDScan verify its customers' identities.

72. Plaintiff and Class Members entrusted Defendant with their PII with the understanding that Defendant would safeguard their information.

73. Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

74. By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

75. Defendant had a duty to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

76. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the PII.

77. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and Class

Members. That special relationship arose because Plaintiff and the Class Members entrusted Defendant with their confidential PII, a necessary part of being the customer of a business that contracts with Defendant IDScan for identity verification services.

78. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

79. Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the members of the Nationwide Class and California Subclass.

80. Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and the class members of the Data Breach.

81. Defendant had, and continue to have, a duty to adequately disclose that the PII of Plaintiff and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the members of the Nationwide Class and California Subclass to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

82. Defendant breached its duties, pursuant to the FTCA and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect class members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

(a) Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

(b) Failing to adequately monitor the security of its networks and systems;

(c) Failing to audit, monitor, or ensure the integrity of its vendor's data security practices;

(d) Allowing unauthorized access to Class Members' PII; and

(e) Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

83. Defendant violated Section 5 of the FTCA by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein.

84. Plaintiff and members of the classes were within the class of persons the FTCA was intended to protect and the type of harm that resulted from the Data Breach was the type of harm it was intended to guard against.

85. Defendant's violation of Section 5 of the FTCA constitutes negligence per se.

86. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the members of the Nationwide Class and California Subclass.

87. A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices and the knowledge that Defendant IDscan would be a target because of the industry it operates in and the service it provides.

88. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to them.

89. Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if the PII were wrongfully disclosed.

90. Plaintiff and the Nationwide Class and California subclass were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII

of Plaintiff and the members of the Nationwide and California Subclass, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems.

91. It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

92. Plaintiff and the Class had no ability to protect their PII that was in, and remains in, Defendant's possession.

93. Defendant was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

94. Defendant's duty extended to protecting Plaintiff and the Nationwide Class and California Subclass from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

95. But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Nationwide Class and California Subclass, the PII of Plaintiff and the Nationwide Class and California Subclass would not have been compromised.

96. There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The PII of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

97. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of

privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; and (vi) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

98. As a direct and proximate result of Defendant's negligence, Plaintiff and the Nationwide Class and California Subclass have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

99. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

100. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

101. Defendant's negligent conduct is ongoing, in that it still holds the PII of Plaintiff and Class Members in an unsafe and insecure manner.

102. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**Breach of Implied Contract**
**(On Behalf Of The Nationwide Class And California Subclass)**

103. Plaintiff hereby re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

104. Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class and California Subclass against Defendant.

105. Plaintiff and Class Members were required to provide their PII to Defendant as a condition of receiving services from Defendant IDScan's partners.

106. Plaintiff and the Class entrusted their PII to Defendant. In so doing, Plaintiff and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

107. In entering into such implied contracts, Plaintiff and Nationwide Class and California Subclass Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

108. Implicit in the agreement between Plaintiff and Class Members and the Defendant to provide PII, was the latter's obligation to: (a) take reasonable steps to safeguard that PII, (b) prevent unauthorized disclosures of the PII, (c) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses, (d) retain the PII only under conditions that kept such information secure and confidential.

109. The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

110. In accepting the PII of Plaintiff and Class Members, Defendant understood and agreed that it was required to reasonably safeguard the PII from unauthorized access or disclosure.

111. On information and belief, Defendant further promised to take reasonable measures to comply with industry standards and to make sure that Plaintiff's and Class Members' PII would remain protected.

112. Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

113. Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

114. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

115. Defendant breached the implied contracts it made with Plaintiff and the members of the Nationwide Class and California Subclass by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiff and the members of the Nationwide Class and California Subclass once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

116. As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members sustained damages, as alleged herein, including the loss of the benefit of the bargain.

117. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

118. Plaintiff and Members of the Nationwide Class and California Subclass are also entitled to injunctive relief requiring Defendant to, inter alia, (i) strengthen its data

security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**COUNT III**
**Breach Of Third-Party Beneficiary Contract**
**(On Behalf of Plaintiff, the Nationwide Class, and California Subclass)**

119. Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

120. Hertz entered into a written contract with Defendant IDScan to provide services.

121. In exchange, Defendant IDScan agreed, in part, to implement adequate security measures to safeguard the Sensitive Information of Plaintiff and the Class and Subclass and to timely and adequately notify them of the Data Breach.

122. This contract was made expressly for the benefit of Plaintiff and the Class, as Plaintiff and Members of the Class and Subclass were the intended third-party beneficiaries of the contract entered into between Hertz and Defendant IDScan. Defendant IDScan knew that, if it were to breach the contract with Hertz, Hertz's customers—Plaintiff and Class Members—would be harmed.

123. Defendant IDScan breached the contract it entered into with Hertz by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiff's Sensitive Information from unauthorized disclosure to third parties, and (iii) promptly and adequately notify Plaintiff and Members of the Class and Subclass of the Data Breach.

124. Plaintiff and the Class were harmed by Defendant IDscan's breach of its contract with Hertz, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

125. Plaintiff and Class Members are also entitled to their costs and attorney's fees incurred in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For a determination that this is a proper class action;

(b) For an order certifying the proposed Nationwide Class, the California Subclass under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the proposed Class and Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Class and Subclass;

(c) For an order declaring Defendant's conduct violates the statutes referenced herein;

(d) For an order finding in favor of Plaintiff and members of the Class and Subclass on all counts asserted herein;

(e) For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

(f) For prejudgment interest on all amounts awarded;

(g) For an order of restitution and all other forms of equitable monetary relief;

(h) For injunctive relief as pleaded or as the Court may deem proper;

(i) For an order awarding Plaintiff and members of the Class and Subclass their reasonable attorneys' fees and reimbursement of litigation expenses and costs of suit; and

(j) For such other and further relief as the Court may deem proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: September 2, 2026

Respectfully submitted,

By: */s/ Thomas M. Beh*
Thomas M. Beh (La. Bar No. 24018)
**Murray Law Firm**
701 Poydras Street
Suite 4250
New Orleans, LA 70139

**BURSOR & FISHER, P.A.**

L. Timothy Fisher (*Pro Hac Vice Forthcoming*)
Daniel S. Guerra *(Pro Hac Vice Forthcoming)*

Joshua B. Glatt *(Pro Hac Vice Forthcoming)*
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
dguerra@bursor.com
jglatt@bursor.com

*Attorneys for Plaintiff and the Putative Classes*